IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LINDA FLINT EDGE,        ) | |
|     Plaintiff,        ) | |
|             ) | |
| v.        ) | No.   04-12134  DPW |
|             ) | |
| NORFOLK FINANCIAL CORPORATION        ) | |
| and DANIEL W. GOLDSTONE,        ) | |
|     Defendants.        ) | |

## SECOND DECLARATION OF YVONNE W. ROSMARIN

Yvonne W. Rosmarin declares under penalty of perjury, as provided for by the laws of the United States, 28 U.S.C. §1746, that the following statements are true and correct and made on the basis of her personal knowledge:

1.  I have no agreement to split fees with my client.

2.  John Roddy and Edwin Smith are professional acquaintances and not personal friends. I have never worked on a case with John Roddy. I have received not more than a handful of referrals from Attorney Roddy's office over the ten years I have been in private practice.

### Previous Settlement Offers

3.  On January 7, 2005, Plaintiff filed a motion to vacate the judgment Defendants had obtained a judgment against her in the small claims lawsuit. A copy of Plaintiff's motion, filed, was attached to Defendants' Assented-to Motion for Leave to Supplement the Record filed on May 2, 2005.

4.  I did not represent Plaintiff on her motion to vacate the judgment in small claims court. This was because I had had previous conversations about the Plaintiff's case with Kevin Callahan, the

same Assistant Clerk-Magistrate who presided over Plaintiff's case. This occurred when I tried to obtain copies of court documents in the Plaintiff's small claims lawsuit after she was unable to do so due to problems in that court's clerk's office. The court administration directed me to discuss the matter with Callahan who, unknown to me at the time, turned out to have presided over Plaintiff's case. Because of these previous *ex parte* conversations with Callahan relating to Plaintiff's case, I decided that it was important to avoid the appearance of impropriety by not representing Plaintiff in that case and she was represented by other counsel. I was present in the courtroom at the hearing on Plaintiff's motion to vacate.

5. On January 11, 2005, I spoke with Defendants' counsel John J. O'Connor. He told me that he had just learned that Plaintiff had filed the motion to vacate. He asked if Plaintiff was interested in settling. I told him that we were always interested in discussing settlement and asked if he had an offer. He told me that he would tell his client to just forgive the debt and walk away from it if Plaintiff would drop her federal suit. He did not at any time during this conversation offer to pay Plaintiff's attorney's fees.

6. In the January 11, 2005 conversation I also told Attorney O'Connor I believed that Plaintiff had a very strong FDCPA case and that Defendants' motion to dismiss, which was fully briefed and still pending, would be denied (which it was). I told him that Plaintiff had a chance, at that time, to get the judgment he was offering to forgive vacated through her motion in small claims court, as that motion was still pending, and still have her affirmative claim against Defendants in federal court. Attorney O'Connor told me that he had not yet decided whether he would represent Defendant Norfolk in that motion, although he ultimately did represent Norfolk on that motion.

7. I called Plaintiff on January 11, 2005 and left a message and she called me back on

January 12, at which time we discussed Defendants' offer. My notes of the conversation reflect that I told her Defendants were not offering attorney's fees, as Attorney O'Connor did not offer any in our January 11 settlement discussion. Plaintiff rejected Defendants' offer to merely forgive their small claims court judgment of $1,704.70 in exchange for her dismissal of this case.

      8.     On January 31, 2005, Plaintiff, in writing, offered to settle the case for $14,000, which did include Plaintiff's attorney's fees.

      9.     On February 2, 2005, I spoke with Attorney O'Connor regarding setting a new date for the Scheduling Conference. He did not discuss settlement or make any counter offer to Plaintiff's offer.

      10.     On February 18, 2005, at the hearing on Plaintiff's small claims court motion to vacate, Defendants argued that vacating the judgment in the small claims lawsuit would have an impact on Defendants' pending motion to dismiss in her FDCPA case in federal court. The assistant clerk-magistrate's denial of Plaintiff's motion stated no reasons therefor.

### Number of Hearings on Motion to Dismiss

      11.     At the March 24, 2005 Scheduling Conference, the Court set a hearing on Defendants' motion to dismiss for May 4, 2005. The March 24 court appearance was never set for a hearing on Defendants' motion to dismiss.

### Plaintiff's Work on Discovery

      12.     On May 4, 2005, after denial of Defendants' motion to dismiss, I spoke with Attorney O'Connor in the courthouse. I asked him if his clients would be interested in settlement at that time. He told me that Defendants would not pay an amount in the range of $14,000. At that time, Plaintiff's attorney's fees were over $16,000. I took this as an indication that Defendants were not seriously

interested in paying a reasonable amount for Plaintiff's attorney's fees and considered further settlement discussions to be a waste of time.

13. On May 4, 2005, in courthouse conversations with Attorney O'Connor after denial of Defendants' motion to dismiss, when Attorney O'Connor told me that he had provided all documents he thought were relevant I indicated that I believed that there might be other relevant documents and that Plaintiff was planning to send requests for production and interrogatories to Defendants prior to any depositions. Attorney O'Connor told me that he would be busy with trials beginning in June 2005 and we discussed the importance of taking Defendants' depositions as soon as possible.

14. Because of Attorney O'Connor's trial schedule, I began preparing a list of areas of inquiry for and documents to be produced at a Fed. R. Civ. P. 30(b)(6) deposition of Defendant Norfolk Financial Corporation ("Norfolk"), as well as comprehensive written discovery to each defendant so that Plaintiff could receive their responses and document production prior to the anticipated depositions. Because of the timing requirements of the discovery rules and Attorney O'Connor's trial schedule, this work was necessary in order to obtain Defendants' depositions as soon as possible within the short discovery period assigned by the Court. This discovery work was based on the specific issues involved in this case.

15. I determined that Plaintiff would need a Fed. R. Civ. P. 30(b)(6) deposition of Defendant Norfolk Financial Corporation ("Norfolk"), possibly followed by the individual deposition of Defendant Daniel Goldstone ("Goldstone"), if necessary, based on my attendance at a past individual deposition of Goldstone in another case, *Martin, et al. v. Sands, et al.*, 62 F. Supp. 2d 196 (D. Mass. 1999) and my review of the transcript of that deposition. (Review of that transcript was not included in the time submitted in Plaintiff's fee petition.) In my opinion, Goldstone's responses in that deposition to

questions regarding operation of Goldstone & Sudalter, P.C., the collection law firm of which he was the sole owner, were often vague, equivocal or evasive. To guard against similar responses in this case, I determined that Plaintiff needed a specific, thorough list of areas of inquiry and documents to be produced at Norfolk's Rule 30(b)(6) deposition, as well as several specific, thorough interrogatories and document requests to precede the deposition. In addition, in Goldstone's previous deposition in *Martin v. Sands,* he had indicated that Goldstone & Sudalter, P.C. had no ability to pay the judgment entered against it in *Sears, Roebuck & Co. v. Goldstone & Sudalter*, 128 F. 3d 10 (1st Cir. 1997), even though the amount of that judgment was the same as the amount Goldstone & Sudalter, P.C. had collected in fees from Sears, plus attorney's fees.

16. I did not receive Defendants' offer of judgment until after I had essentially completed drafting Plaintiff's written discovery requests and exhibits to the deposition notices for Defendants' depositions, containing lists of areas of inquiry and documents to be produced thereat.

17. After receiving Defendants' offer of judgment, for $1,000 (inclusive of costs and interest) plus reasonable attorney's fees, Plaintiff and I determined that, as Plaintiff's only taxable cost in this case was her $150.00 filing fee and pre-judgment interest was negligible, it was reasonable to accept Defendants' offer rather than continuing to litigate for an additional $150, driving up Plaintiff's attorney's fees.

**Plaintiff's Counsel's Experience and Practice**

18. Although none of my Massachusetts cases have gone to trial because the defendants have all settled them prior to that time, I have tried innumerable cases in the Circuit Court of Cook County in Chicago, Illinois. I represented the plaintiffs in a three week trial of a class action in the United States District Court for the Northern District of Illinois in *Parents in Action on Special*

5

*Education (P.A.S.E), et al. v. Hannon, et al.* No. 74 C 3586, which is mentioned in my previously filed declaration at ¶ 8, as is my membership in the Trial Bar of the District Court for the Northern District of Illinois at ¶ 1.

19.     After my one-year clerkship with Judge Luther M Swygert of the United States Court of Appeals for the Seventh Circuit, I litigated cases in both state and federal court in Illinois from January 1978 through August 1988 while a staff attorney at the Legal Assistance Foundation of Chicago. Most of these cases were consumer law cases.

20.     My work at the National Consumer Law Center in Boston included consulting with legal services and private attorneys on factual, legal and strategic issues of consumer law in their litigation cases, as well as training them to litigate consumer law cases.

21.     I work from my own private office in a commercial building in Arlington Center, which consists of a three-room suite. This building has been commercial space, as are the surrounding buildings, since at least some time in the early 1980's. As many of the office buildings in the area and on the same street and in many suburban Boston locations, it was at one time a residential building. My office is a large building that, in its residential days, consisted of apartments, not a single family home. Several other attorneys and two other businesses have offices in this building. I often employ college students as interns and have employed a part-time legal assistant in the past.

22.     I raised my rate and began charging clients in most individual cases $325 per hour in early March, 2005. While most of my cases are contingency fee cases, occasionally clients pay me an hourly, non-contingency fee. My rate for work in class action cases involving damages have been $375 per hour for several years.

23.     My consumer law practice does not process cases as a "mill." Each client and case is

6

given individual attention and each case is based on its individual facts.

24. Defendants' motion to dismiss was the first such motion involving either the Rooker-Feldman doctrine, issues of state law claim and issue preclusion or judicial estoppel filed in any of my cases. Prior to Defendants' motion to dismiss, I had never had occasion to address these particular issues, and thus, no reason to develop "boilerplate forms" involving them.

25. This fee petition is only the second that I have had occasion to file in a case in Massachusetts. The first was approximately one year ago in *Neal Osofsky v. Sears, Roebuck & Co.*, No. 03-11192 JLA and it involved only a small amount of fees, awarded on a motion to compel. The issues in that case were very specific to that case and very different from those involved in this case. I therefore did not have any "boilerplate forms" for a fee petition based on the more general issues involved in this case.

### Defendants' Counsel's Work on This Case

26. On December 3, 2004, I spoke with Attorney O'Connor to request an extension of time to file Plaintiff's opposition to Defendants' motion to dismiss, due to the intervening Thanksgiving holiday and my schedule. He responded to my request by stating that instead of opposing Defendants' motions Plaintiff could "just dismiss the case." He insisted that I should not need the extra time I sought to respond because it was a "cookie-cutter ten-page motion."

Executed at Arlington, Massachusetts on May 31, 2005

s/Yvonne W. Rosmarin
Yvonne W. Rosmarin